**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

| | |
|---|---|
| **RUBEN LAMB,** | |
| Plaintiff, | |
| v. | Civil Action No. 5:10-CV-253 |
| **HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY,** | |
| Defendant. | |

**ORDER**

This case arises from Defendant Hartford Life and Accident Insurance Company's ("Hartford") denial of Plaintiff Ruben Lamb's ("Plaintiff") long-term disability ("LTD") benefits. Plaintiff claims that Hartford wrongfully determined that he did not qualify for LTD benefits in violation of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). In response, Hartford contends that the termination of coverage was appropriate, but even if it was *de novo* wrong, the decision was reasonable under the arbitrary and capricious standard.

Before the Court are Defendant's Motion for Judgment on the Administrative Record (Doc. 28) and Plaintiff's Motion for Summary Judgment (Doc. 25). For the reasons stated below, Defendant's Motion is granted and Plaintiff's Motion is denied. The Court makes the following Findings of Fact and Conclusions of Law.

## I.  FINDINGS OF FACT [1]

### a.  The Policy

The starting point for any judicial review is the policy itself. Effective January 1, 2006, Hartford issued Group Policy No. GLT-675456 ("Policy") to Plaintiff's employer, Wal-Mart Stores, Inc. ("Wal-Mart"). This Policy was intended to fund LTD benefits for Wal-Mart employees, and it was sponsored and maintained by Wal-Mart within the meaning of Section 3(1) of ERISA. *See* 29 U.S.C. § 1002(1).

The definitions within a policy are of the utmost importance in any ERISA case, and the present case is no exception. The Policy at issue defines disability for the first twelve months as the inability to perform the claimant's "own occupation." After the first twelve months of benefits, disability is defined as the inability to perform "any occupation." (Administrative Record ("AR") 000282.[2]) "Any occupation" is defined as "any occupation for which You are qualified by

---

[1] When a decision is based on the agreed-upon administrative record, judicial economy favors using findings of fact and conclusions of law under Federal Rule of Civil Procedure 52, as opposed to using summary judgment under Federal Rule of Civil Procedure 56. Adams v. Hartford Life and Acc. Ins. Co., 694 F. Supp. 2d 1342, 1345 n. 1 (M.D. Ga. 2010) (citing Davis v. Liberty Life Assurance Co. of Boston, 542 F.3d 1352, 1363 n. 5 (11th Cir. 2008)).

The administrative record serves as the basis for the Findings of Fact and Conclusions of Law. *See* Glazer v. Reliance Standard Life Ins. Co., 524 F.3d 1241, 1246 (11th Cir. 2008) (determining that "[w]hen conducting a review of an ERISA benefits denial under an arbitrary and capricious standard …, the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made.").

[2] All references to the Administrative Record will be noted without the preceding zeros. Thus, AR 000282 will be noted simply as AR 282.

education, training or experience that has an earnings potential greater than the

lesser of: 1) 50% of Your Pre-disability Earnings; or 2) the Maximum Monthly

Benefit." (AR 279.) The Policy also contains the following provisions regarding

termination of coverage:

> **Termination**: *When will my coverage stop?*
>
> Your coverage will end on the earliest of the following:
>
> [T]he date Your Employer terminates Your employment. Your employment terminates on the date You cease to be a Full-time Active Associate in an eligible class for any reason, unless coverage is extended under the Continuation Provisions.[3]
>
> **Coverage while Disabled:** *Does my insurance continue while I am Disabled and no longer an Active Associate?*
>
> If You are Disabled and You cease to be an Active Associate, Your Insurance will be continued: during the Elimination Period[4] while You remain Disabled by the same Disability; and after the Elimination Period for as long as You are entitled to benefits under the Policy.

(AR 285.)

The Policy expressly provides Hartford with "full discretion and authority to

determine eligibility for benefits and to construe and interpret all terms and

provisions of The Policy." (AR 293.)

### b. Plaintiff's Employment

---

[3] The "Continuation Provisions" apply only to leaves of absence, layoffs, or leaves under the Family and Medical Leave Act. (AR 285.)

[4] The Elimination Period is defined as "the number of consecutive days at the beginning of any one period of Total Disability which must elapse before benefits are payable." (AR 279.)

Plaintiff worked as a truck driver with Wal-Mart for twelve years. The job description of a truck driver included the following responsibilities:

> Properly operate an over the road tractor/trailer unit safely and efficiently while complying with all Company, local, state, and federal laws/guidelines. Sitting for extended periods of time, firm grasping of steering wheel while shifting gears. Repetitive foot motion to operate brake, clutch, and fuel pedals. Climbing sufficient to gain entry/exit from tractor cab, deck plate, or trailer as required. Upper and lower body mobility and strength to climb into a cabover tractor. Walking to/from equipment locations, such as distribution center, stores, clubs, vendors. Occasionally moving/feathering freight inside trailer.

(AR 22.) Plaintiff worked until March 20, 2008, when he ceased driving for Wal-Mart and applied for disability benefits. (AR 252-53.)

### c.  **Plaintiff's Claim for Long-Term Disability Benefits**

On June 16, 2008, Wal-Mart advised Hartford that Plaintiff was claiming a disability due to a staph infection in his right elbow. (AR 272.) On his application for disability benefits, Plaintiff cited symptoms of "joints aching" and complained that he was unable to walk or ride for long periods of time. (AR 252-55.) Included in his application was an attending physician statement ("APS") completed by Jonathan Velasquez, M.D., Plaintiff's internist and primary care physician. (AR 257-58.) In the APS, Dr. Velasquez confirmed that Plaintiff's primary diagnosis was septic olecranon bursitis in the right elbow and his secondary diagnosis was degenerative disc disease of the lumbar spine. (AR 31-32, 257.) Dr. Velasquez reported that Plaintiff had undergone an open excision of a septic olecranon bursa on his right elbow on June 5, 2008. (AR 257.) Dr. Velasquez noted that

4

Plaintiff had been referred to William B. Wiley, M.D., an orthopedist, and had also been referred to a corneal surgeon because of impaired vision in his left eye. (AR 258.)

Dr. Wiley completed a physical examination of Plaintiff on June 23, 2008, eighteen days after the excision by Dr. Velasquez. (AR 130.) Dr. Wiley noted that Plaintiff's "pain and swelling is decreasing. He is feeling better." Id. Plaintiff was told to work on his range of motion and to come back to see Dr. Wiley in three weeks. Id. Three weeks later, on July 14, 2008, Plaintiff returned to Dr. Wiley, who noted that Plaintiff's chief complaint was "resolving right elbow pain." (AR 131.) Plaintiff was ordered to take antibiotics and return in three weeks.

In the meantime, on July 15, 2008, Hartford sent a letter to Plaintiff informing him that he was approved for LTD benefits under the Policy. (AR 244-46.) Hartford notified Plaintiff that he was considered disabled from his "own occupation," which qualified Plaintiff for twelve-months of coverage. Hartford informed Plaintiff that to be eligible for LTD benefits beyond June 20, 2009, Plaintiff would have to show that he was "totally disabled" within the meaning of the Policy, which would mean showing that he was precluded from working "any occupation." (AR 50.) Absent a showing of "total disability," Plaintiff's coverage period for his disability from his "own occupation" was scheduled to run from June 20, 2008 until June 19, 2009.[5]

---

[5] It is worth noting that Plaintiff applied for Social Security disability benefits in August 2008. (AR 230.) His claim for benefits was denied on November 20,

In September 2008, it was determined that Plaintiff had degenerative joint disease ("DJD") in his right knee. (AR 133.) In October 2008, Dr. Wiley saw Plaintiff again, and noted that Plaintiff said he was "doing pretty good … [h]e has some intermittent pain along the knee and elbow, but doing a lot better." (AR 137.) Around the same time, Plaintiff told Hartford that while he wanted to return to work, he was worried about his eye, which had been giving him problems. (AR 25.) In August 2008, Plaintiff visited Malcolm Moore, Jr., M.D., an ophthalmologist, who diagnosed him with keratoconus/pellucid marginal degeneration in his left eye and forme fruste keratoconus in his right eye. (AR 226.) In November 2008, Dr. Moore noted that Plaintiff was unable to wear contact lenses and was wearing glasses. (AR 225.)

In December 2008, Plaintiff repeated his concerns about his eye to Hartford, declaring that his knee and back were sore, but were not limiting his work, and that his eyes were what prevented him from returning to work. (AR 23.) Dr. Lee completed a Visual Functional Evaluation on April 13, 2009 and found that Plaintiff's best corrected vision was 20/20 in both eyes, but that his best corrected distance vision was still 20/40 in his right eye and 20/80 in his left eye. (AR 183-84.) Dr. Lee noted that Plaintiff's ability to drive commercially was

---

2008. (AR 207.) The Social Security Administration noted that "[a]lthough you may experience discomfort, the evidence shows you are still able to move about to use your arms, hands, legs, and back in a satisfactory manner … Your overall condition does not meet the basic definition of disability as defined by Social Security." (AR 207.)

restricted because of his visual impairment. Id. This was the only restriction noted by Dr. Lee at the time.

In a letter to Plaintiff dated December 29, 2008, Hartford informed Plaintiff that if he was to receive LTD benefits beyond June 20, 2009, he would have to show that he was disabled from "any occupation," as it was defined within the Policy. Several months later, in April 2009, Hartford warned Plaintiff that no new evidence of disability had been submitted sufficient to show that Plaintiff was unable to perform "any occupation," and therefore, on June 20, 2009, Plaintiff would not meet the definition of "total disability" under the Policy and would not qualify for additional coverage. (AR 43-46.)

In May 2009, Plaintiff returned to Dr. Wiley, complaining of pain in his left shoulder that he claimed had been present for approximately two months. (AR 139.) It was determined that he had a rotator cuff tear. (AR 141.) Plaintiff was unsure the cause of the injury. (AR 139.) Surgery was discussed as a possible treatment. (AR 141.) Plaintiff visited Dr. Wiley twice more in May, complaining of pain in his right knee and an aching in his low back, as well as continued problems with his shoulder. (AR 142, 145.) Dr. Wiley completed an APS on May 22, 2009, which stated that Plaintiff's physical impairment constrained him to no more than ten minutes standing, no more than 100 yards walking, no more than thirty minutes of sitting, no more than ten pounds of weight to be lifted or carried, no reaching or working overhead, no pushing or pulling more than ten pounds of weight, and no driving an automatic transmission. (AR 152.)  Around this time,

Plaintiff told a Hartford claims representative that he "cannot pass a physical and cannot get a job anywhere doing anything." (AR 11.)  Hartford agreed to review additional information from Plaintiff regarding his disability status after the anticipated termination of his coverage on June 20, 2009. (AR 9.)

In early June 2008, Hartford sent to requests to Dr. Wiley for clarification of Plaintiff's functionality and medical records. (AR 39.) On June 18, 2009, Dr. Wiley responded to Hartford's request, stating that Plaintiff was capable of sedentary work. (AR 127-28.) On June 19, 2009, Dr. Wiley prepared a report after Plaintiff came in for an office visit. Dr. Wiley stated that Plaintiff's chief complaints were left shoulder pain, right knee pain, and low back pain. (AR 90.) Plaintiff was diagnosed with low back pain with lumbar DJD and radiculopathy, right knee pain with DJD, and left shoulder pain with a rotator cuff tear. Id. In a section marked "Plan", Dr. Wiley stated that "[a]t this point, I feel like [Plaintiff] is capable of doing full time sedentary work …." Id.

In June 2009, after Plaintiff's functionality was established by Dr. Wiley, Roger K. McNeeley, Plaintiff's vocational rehabilitation clinical case manager, completed an employability analysis for Plaintiff. After his analysis, Mr. McNeeley issued an employability analysis report ("EAR").[6] The report took into

---

[6] This was the second EAR prepared by Mr. McNeeley for Plaintiff. The first EAR was completed in April 2009, when nine potential occupational matches were found for Plaintiff. (AR 155-57.) The April 2009 EAR was broader in scope than the June 2009 EAR, because it included occupations that required some light activity. Based on Dr. Wiley's recommendation, the second EAR was limited

consideration Plaintiff's functional capabilities and physical restrictions, as well as his education, training, and work history. (AR 107-25.) Based on his analysis, Mr. McNeeley determined that Plaintiff matched with thirty-five occupations. (AR 108.) These thirty-five matches were reviewed in more detail, and some were eliminated because they were "not prevalent in the national economy, or did not meet the required earning potential, or require skills not already demonstrated by [Plaintiff]." (AR 108.) Plaintiff ultimately was matched with five semi-skilled and unskilled occupations including: Batch Records Clerk; Routing Clerk; Jacket Preparer; Dispatcher, Maintenance Services, and Automobile Locator. (AR 107-09.) Each of these positions was considered to be a "fair" match to Plaintiff's skill set. (AR 114.) A "fair" match indicates that the employee would be required to complete training in tools and/or materials to be prepared for the job. (AR 114.)

Plaintiff's coverage terminated on June 20, 2009. Plaintiff's attorney was advised in a letter that Plaintiff "does not meet the policy definition of 'Total Disability' that became applicable on 06/20/09. Therefore, no LTD benefits are payable beyond 06/19/09." (AR 38-41.) Hartford stated that, based on records from Dr. Lee, Dr. Wiley, and Mr. McNeeley, Plaintiff "was not prevented from performing the essential duties of Any Occupation. Because of this, he does not meet the policy definition of Disability as of 06/20/09 and LTD benefits will terminate on that date." (AR 40.)

---

to sedentary jobs. In June 2009, there were five occupational matches found by Mr. McNeeley for Plaintiff. These are described in more detail above.

On July 14, 2009, Dr. Wiley completed another report after an office visit with Plaintiff and again noted pain in the low back, right knee, and left shoulder. (AR 91.) On August 24, 2009, another one of Dr. Wiley's reports noted that Plaintiff complained of left groin pain and low back pain and said that he could not stand for a prolonged period of time because of "aching, burning pain." (AR 92.) Dr. Wiley noted that this pain "wakes him up from sleep at night. It has been going on for 2-3 months and is steadily getting worse." (AR 92.) Plaintiff was diagnosed with having low back pain with lumbar DJD and left hip pain. (AR 93.)

By September 9, 2009, Plaintiff was in Dr. Wiley's office again, complaining of left hip pain. (AR 94.) He was diagnosed as having left hip pain with DJD andavascular necrosis with some early collapse. Id. Dr. Wiley noted that "at this point, he is going to need a hip replacement somewhere down the line, depending on his pain and what is going on." Id. A visit on September 22, 2009 confirmed necrosis in the left hip, as well as continued pain in the low back, right knee, and left shoulder. (AR 95.) In his affidavit, dated October 5, 2009, Plaintiff testified to his physical condition. (AR 101-05.) At that point, his physical ailments included failing vision; significant pain on a daily basis in his right elbow, right knee, left shoulder, left hip, and low back; arterial blockages, elevated cholesterol, and hypertension; and depression based on his medical conditions. Id.

### d.  Plaintiff's Appeal

On July 6, 2009, Plaintiff informed Hartford that he wished to appeal Hartford's decision to terminate his LTD benefits. (AR 3.) Hartford's review process is independent from the initial coverage determinations. (Doc. 28-1, p. 5.) Members of the Hartford Appeals Unit make independent assessments of claims based on the evidence in the file; they do not have any contact with the representative who made the initial decision about coverage. Id. There is no personal benefit to be gained by Appeals representatives based on the number of claims that are approved or denied. Id.

To conduct the appeal, Hartford requested updated medical records from Dr. Wiley. (AR 1-2.) Included in the updated records was a September 22, 2009 letter from Dr. Wiley, written after an appointment with Plaintiff. The letter noted that Plaintiff had:

> low back pain with lumbar DJD and right sacroilitis. He also has left hip avascular necrosis with some arthritis setting in and collapse of the femoral head. He has right knee DJD and left shoulder rotator cuff tear. He also has some eye problems as well and has some heart problems. He is currently unable to work and I feel at this stage with regards to his avascular necrosis of his hip, which has just recently diagnosed, it would be extremely difficult for him to maintain a full time job and it would be highly unlikely that he could perform even sedentary duties…. [Plaintiff] needs to have his hip replaced, but this would only solve some of his problems. He is also going to need a total knee replacement and left shoulder arthroscopic rotator cuff repair done as well.

(AR 100.)

Hartford Appeals Specialist, Robyn J. Cote, reviewed the evidence submitted on appeal, including all updated records from Dr. Wiley. Based on her

review of the evidence, Cote determined that the June 20, 2009 termination of benefits should be upheld because, as of June 20, 2009, Plaintiff no longer met the definition of total disability under the terms of the Policy.

On November 5, 2009, Hartford sent an official letter to Plaintiff, informing him that his appeal was found to be without merit. The letter indicated that Hartford was upholding its original determination that Plaintiff was not disabled from "any occupation" as of June 20, 2009. (AR 35-36.)

## II. CONCLUSIONS OF LAW

### a. ERISA Analytical Framework

ERISA permits a person denied benefits under an employee benefit plan to challenge that denial in federal court. 29 U.S.C. § 1132(a)(1)(B); *see also* Adams v. Hartford Life and Acc. Ins. Co., 694 F. Supp. 2d 1342, 1352 (M.D. Ga. 2010). However, ERISA does not provide a standard for reviewing benefits decisions made by plan administrators or fiduciaries. Blakenship v. Metropolitan Life Ins. Co., 644 F.3d 1350, 1354 (11th Cir. 2011). Without clear guidance from ERISA, the Eleventh Circuit developed a multi-step framework to direct courts in reviewing a plan administrator's benefits decision. Id. This framework is based on guidance from the Supreme Court of the United States and their decisions in Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 128 S. Ct. 2343 (2008), and Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 S. Ct. 948 (1989). The steps are as follows:

(1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision is in fact "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

Blankenship, 644 F.3d at 1355.

### b. Burden of Proof

The burden of proving entitlement to ERISA plan benefits rests on the claimant. Horton v. Reliance Standard Life Ins. Co., 141 F.3d 1038, 1040 (11th Cir. 1998) (per curiam). This is true "regardless of whether the claim denial was from the onset of the claimed disability or whether the claim denial was a termination of benefits that had been paid before the denial." Hufford v. Harris Corp., 322 F. Supp. 2d 1345, 1360 (M.D. Fla. 2004). In this case, the burden is on Plaintiff to show that he was entitled to ERISA benefits under the Policy.

### c. Step One: Whether Hartford's Denial of Plaintiff's LTD Benefits Was Wrong

The first step in the <u>Blankenship</u> framework requires the Court to determine whether Hartford's denial of Plaintiff's LTD benefits should be considered *de novo* wrong. 644 F.3d at 1355. A decision made by a plan administrator is "wrong" if, after reviewing the decision from a *de novo* perspective, the court disagrees with the administrator's decision. <u>Glazer v. Reliance Standard Life Ins. Co.</u>, 524 F.3d 1241, 1246 (11th Cir. 2008). The court must consider whether it would reach the same decision as the administrator, based on the record that was before the administrator at the time the decision was made. <u>Id.</u>

In this case, Hartford's decision was not *de novo* wrong. As of June 20, 2009, Plaintiff was not considered "totally disabled" from "any occupation" as defined by the Policy. Dr. Wiley submitted a form to Hartford on June 18, 2009 stating that Plaintiff was capable of performing sedentary work.[7] (AR 127-28.) Additionally, the next day, after Plaintiff visited Dr. Wiley, Dr. Wiley reported that Plaintiff's chief complaints were left shoulder pain, right knee pain, and low back

---

[7] Plaintiff makes an argument that Hartford was "cherry-picking" by relying on the June 18, 2009 statement from Dr. Wiley that Plaintiff was capable of full-time sedentary work. Plaintiff argues that by relying on the June 18 statement, Hartford completely disregarded a statement dated May 22, 2009 in which Dr. Wiley limited Plaintiff's sitting to thirty minutes at a time, among other restrictions. (AR 151-52.) The Court does not see a need to reconcile these two reports, as they are not conflicting. A person can perform sedentary work and take breaks every thirty minutes to stand up and stretch. Plaintiff's "cherry-picking" argument is found to be without merit.

pain. (AR 90.) Based on his physical condition at the time, Dr. Wiley noted that "[a]t this point, I feel like [Plaintiff] is capable of doing full time sedentary work …." Id.

Plaintiff claims that the discovery of his hip problems should have qualified him for additional LTD benefits under the Policy. However, these hip problems were not apparent to Plaintiff, Dr. Wiley, or Hartford until well after the date that Plaintiff's benefits terminated. August 24, 2009 is the first time that Plaintiff complained to Dr. Wiley of any type of hip-related issues (AR 92) and September 2009 marked the month when Plaintiff was diagnosed with DJD andavascular necrosis with some early collapse in his left hip (AR 94). It was not until late September when Dr. Wiley noted that "[Plaintiff] is currently unable to work and I feel at this stage with regards to his avascular necrosis of his hip, which has recently been diagnosed, it would be extremely difficult for him to maintain a full time job and it would be highly unlikely that he would be able to perform even full time sedentary duties." (AR 100.)

Plaintiff argues that the problems with his hip should "relate back." He contends that later-in-time medical reports should be considered in context. When put in context, Plaintiff argues that the medical reports issued by Dr. Wiley in September demonstrate that his hip problem started before the June 20, 2009 expiration of coverage. Specifically, Plaintiff points to Dr. Wiley's August 24, 2009 report, in which he states

> The patient is … complaining of left groin pain and low back pain. The patient has trouble standing for a prolonged period of time, has aching, burning pain. He has pain that wakes him up from sleep at night. It has been going on for 2-3 months and is steadily getting worse.

(AR 92.) Plaintiff argues that Dr. Wiley's report effectively demonstrates that the hip pain began at least two months prior to the date of the report, or around mid-June 2009. According to Plaintiff, this report proves that he was disabled on or before June 20, 2009, and therefore should still be receiving disability benefits.

Plaintiff's argument is misguided. If courts were to allow symptoms to "relate back," the legal floodgates would open and insurance fraud would be rampant. When Hartford made the decision to terminate Plaintiff's disability coverage, the decision was based on the information that was available as of June 2009. That information clearly established that Plaintiff was not completely disabled, but was capable of performing full-time sedentary work. Additionally, during the Hartford internal appellate process, Plaintiff was invited to send additional information, including all medical records dating from May 22, 2009 until the time of the appeal. (AR 2.) These later records reflect continued pain in Plaintiff's low back, right knee, and left shoulder. (AR 91.) However, the fact remains that Plaintiff did not complain of any hip pain at all until August 2009 – two months after his insurance coverage expired. (AR 92-93.) Plaintiff visited Dr. Wiley no less than twelve times within an eighteen-month time span. (*See* AR 90, 91, 92-93, 94, 95, 130, 131, 133, 137, 139, 142, 145.) During these numerous visits, Plaintiff's symptoms included pain in his shoulder, knee, and low back, as

16

well as heart trouble, vision problems, and depression. However, hip pain was never mentioned in any way until well over a year had passed since Plaintiff first visited Dr. Wiley.

Plaintiff makes a secondary argument that Hartford's determination was wrong because the Employability Analysis Report completed by Mr. McNeeley was inadequate and did not accurately reflect Plaintiff's job opportunities. Under the Policy, total disability means that a person cannot perform "any occupation." (AR 282.) "Any occupation" is defined as "any occupation for which You are qualified by education, training or experience that has an earning potential of greater than the lesser of: (1) 50% of Your Pre-disability Earnings; or (2) the Maximum Monthly Benefits." (AR 279.) Plaintiff argues that the definition of "any occupation" uses the present tense, which implies that the employee must be able and ready to perform the job right away. He contends that the five occupations that were considered to be matches for Plaintiff were all "fair" matches, which meant that he would have to undergo training in tools and materials before he was able to perform the job. (AR 114.) Under Plaintiff's interpretation, this requirement of additional training means that Plaintiff was not capable of performing these jobs immediately, and thus, the jobs did not fit within the present tense definition of "any occupation." Therefore, Plaintiff argues that the five occupational matches on the EAR should not be considered matches at all, meaning that Hartford was unable to identify any potential job opportunities for him and he should continue to receive benefits.

17

This argument is without merit. The definition of "any occupation" includes the phrase "for which You are qualified by education, training, or experience." (AR 279.) The Policy clearly contemplates a situation when a beneficiary would need to undergo some training to be qualified to perform a new job. Thus, the requirement of having to complete some training does not disqualify the five occupations listed on the EAR from being matches for Plaintiff.

Hartford's decision to terminate Plaintiff's coverage on June 20, 2009 was not *de novo* wrong. It was supported by medical evidence, which revealed no signs of a hip problem until well after the coverage had expired, and was further supported by vocational evidence that Plaintiff could perform at least five jobs that accommodated his physical restrictions, education, and pay requirements. The Court does not doubt that Plaintiff is experiencing pain in his hip which limits his ability to perform certain activities. However, this diagnosis was not made until late September 2009, over three months after Hartford's coverage expired. Based on the administrative record available to Hartford in June 2009, the Court cannot say that Hartford's decision was *de novo* wrong.

### d. Step Two & Three: Whether Hartford had discretion and whether the decision made was "reasonable"

Even if Hartford's decision to terminate benefits was wrong, Hartford would still prevail in this case. The second step in the Blankenship framework asks whether the plan administrator had the discretion to review claims. If the administrator does have discretion, then the third step in the framework asks

18

whether the administrator's decision, even if *de novo* wrong, was based on "reasonable" grounds under the deferential arbitrary and capricious standard. Blakenship, 644 F.3d at 1355.

In this case, the Policy provides Hartford with "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy." (AR 293.) With explicit authority to make benefits decisions, Hartford must only show that the decision to terminate Plaintiff's coverage was "reasonable," and Hartford can easily show that its decision was within reason. The same reasons that support a finding that Hartford was *de novo* right also support a finding that the decision was reasonable.

Hartford made an informed and well-founded decision when it determined that Plaintiff was no longer eligible for benefits in June 2009. Not only did Hartford fully review the medical records that had been submitted during the year-long period from June 2008-June 2009, when insurance coverage was active, but Hartford also asked for any additional records from Dr. Wiley that reflected Plaintiff's medical condition after coverage terminated. (AR 2.) Further, when Plaintiff objected to Hartford's decision, Hartford put Plaintiff's claims through an independent appellate process that confirmed the initial decision.

Plaintiff makes the argument that Hartford's review of the medical records was without the advice and opinion of a medical doctor, and therefore, was unreasonable. However, an insurance company is not required to consult a doctor to make a decision about a policy's coverage. *See* Richey v. Hartford Life

19

& Accident Ins. Co., 608 F. Supp. 2d 1306, 1312 (M.D. Fla. 2009) ("An ERISA administrator is entitled to rely on the opinion of a qualified consultant who neither treats nor examines the claimant, but instead reviews the claimant's medical records.").

Based on a thorough review of the records, Hartford terminated coverage because Plaintiff was not "totally disabled" as of June 20, 2009. His hip pain, first mentioned in August 2009 and diagnosed in September 2009, arose after June 20, 2009, when Plaintiff's coverage had ended. Hartford acted in a reasonable manner, and therefore, the determination that Plaintiff's coverage terminated on June 20, 2009 is upheld.

### III. Overpayment of Benefits

In its Motion for Judgment on the Administrative Record, Hartford makes a counterclaim for overpayment of benefits made to Plaintiff. This Motion is based on language found in the Policy which states that Hartford has

> the right to recover from You any amount that We determine to be an overpayment. You have the obligation to refund to Us any such amount. Our rights and Your obligations in this regard may also be set forth in the reimbursement agreement You will be required to sign when You become eligible for benefits under this Policy.

(AR 292.) According to the Policy, overpayments can include "retroactive awards received from sources listed in the Other Income Benefits definition." Id. The "Other Income Benefits" definition includes

> the amount if any benefit for loss of income provided to You as a result of the period of Disability for which You are claiming benefits under the Policy. This includes the amount of disability or

20

annuity benefits pursuant to any: … 7) the amount of disability benefits under the United States Social Security Act, to which You and Your spouse and/or children may be entitled because of Your Disability.

(AR 300.)

On June 23, 2008, Plaintiff signed an LTD Payment Options and Reimbursement Agreement in which he requested that Hartford pay Plaintiff his monthly LTD benefit with no reduction for any other estimated income benefits which could be distributed in the future. In doing so, Plaintiff signed a statement that read: "I understand that [choosing not to reduce the LTD benefit for other income benefits] may result in an overpayment of my LTD benefits which I will be required to refund to The Hartford in a lump sum." (AR 264.)

In January 2010, Plaintiff was deemed by a Social Security Administrative Law Judge to be disabled as of March 20, 2008. (Doc. 24, p. 13.) Accordingly, Plaintiff received a retroactive award of Social Security Benefits. Hartford now claims that, based on the terms of the Policy, it is due an overpayment balance of $7,183.50 based on Plaintiff's retroactive award.

Plaintiff makes two arguments for why he should not be held responsible for the overpayment. First, Plaintiff claims that under ERISA § 502(a), Hartford has no rightful claim to the LTD benefits paid to Plaintiff from June 19, 2008 until June 20, 2009 because the money was dissipated at the time Plaintiff received his Social Security benefits. Second, Plaintiff argues that Hartford cannot recover

for the overpayment because it does not have a rightful claim to collect Social Security benefits from Plaintiff. These arguments are addressed below.

### a.  Recovery of Overpayment under ERISA § 502(a)

Plaintiff argues that ERISA § 502(a) precludes Hartford from being able to recover any alleged overpayment. Section 502(a) restricts the remedies available in ERISA actions to equitable relief only, stating:

> (a) Persons Empowered to Bring Civil Action. – A civil action may be brought … (3) by a … fiduciary … to obtain other appropriate equitable relief … to enforce … the terms of the plan …"

ERISA § 502(a); 29 U.S.C. § 1132(a).

Relying on Sereboff v. Mid Atlantic Medical Services, Inc., 547 U.S. 356 (2006), Plaintiff argues that Hartford is not eligible to recover funds from Plaintiff because the relief sought is not equitable, and therefore is outside the scope of ERISA § 502(a). Plaintiff argues that the recovery is not equitable because the LTD benefit money given to Plaintiff by Hartford has been dissipated and is no longer identifiable, and therefore, the recovery cannot be in equity. Under Plaintiff's theory, Hartford's claim for the overpayment arose when Social Security awarded Plaintiff retroactive Social Security Benefits on January 2010. By that date, nearly a year after Plaintiff's coverage with Hartford terminated, Plaintiff contends that all of the LTD benefits given to Plaintiff by Hartford were dissipated, and therefore, Hartford no longer can assert a valid claim in equity as to that money. Without an equitable claim, Plaintiff claims that relief is barred by § 502(a).

Plaintiff's argument on this point is misguided. First, Plaintiff misinterprets Sereboff. In that case, the fiduciary of a health plan brought suit against plan beneficiaries under ERISA for an overpayment. Sereboff, 547 U.S. at 359. The question for the Supreme Court was whether the relief sought by the fiduciary was equitable and, therefore, within the scope of § 502(a). The Court determined that the relief was equitable because there were specifically identifiable funds being held in apart from the general assets of the plan participants. Id. at 365.

However, Sereboff does not stand for the premise that if LTD benefit money has been spent and is no longer identifiable, the claim to that money is necessarily void because it is not in equity. To the contrary, the Court stated "no tracing requirement … applies to equitable liens by agreement or assignment." Id. Under Sereboff, when there is an underlying agreement that stipulates to the recovery of overpayments, the overpayment is recoverable under ERISA. Solomon v. Metropolitan Life Ins. Co., 628 F. Supp. 2d 519, 533-34 (S.D.N.Y. 2009) (determining that a fiduciary was entitled to recover overpayment because of underlying agreement, even when specific funds have been spent); Kellner v. First Unum Life Ins. Co., 589 F. Supp. 2d 291, 312-13 (S.D.N.Y. 2008) (recognizing that "where the LTD plan includes an applicable offset provision, its fiduciaries may [ ] recover payments to beneficiaries that are later offset by a retroactive award of Social Security benefits."). Courts across the country have determined that a health plan that provides for recovery of overpayment is considered an equitable lien by agreement, and thus, strict tracing requirements

do not apply. *See* Unum Life Ins. Co. of America v. Harper, 2008 WL 1990338 at

* 2 (M.D. Ga. May 2, 2008); United Air Lines, Inc. Retirement and Welfare Admin.

v. Van Slyck, 2008 WL 2275705 at * 3 (N.D. Ill. Mar. 19, 2008); Bosin v. Liberty

Life Assurance Co. of Boston, 2007 WL 1101187 (W.D. Mich. Apr. 11, 2007)).

This Court agrees that in cases where there is an underlying agreement,

proceeds need not be strictly traceable to be considered within the realm of

equitable relief. To find differently would be to set a dangerous precedent. If

funds were required to be strictly traceable, a plan participant who received an

LTD benefit award could decline to deduct any amount for other future benefits

and then could spend all money received, knowing that he would not be held

responsible for any overpayment if the funds were dissipated. This result would

be illogical.

Plaintiff was made aware of the fact that he could potentially receive

overpayments, and he chose not to withhold any money from his payments to

protect himself against this very situation. Specifically, he signed an LTD

Payment Options and Reimbursement Agreement in which he requested that

Hartford pay his monthly LTD benefit with no reduction for other income benefits.

His signature was below a sentence that read: "I understand that this may result

in an overpayment of my LTD benefits which I will be required to refund to The

Hartford in a lump sum." (AR 264.) Plaintiff cannot now skirt around repaying this

overpayment because he spent the money he was awarded by Hartford between

June 2008 and June 2009.

24

b. **Recovery of Overpayment from Social Security Directly**

Plaintiff also claims that Hartford cannot recover the amount of overpayment by way of taking Plaintiff's Social Security benefits because it would be in violation of Social Security's anti-assignment provision, 42 U.S.C. § 407(a). Plaintiff's argument under § 407(a) is misplaced. "[T]he better reasoned opinions that have addressed this issue hold that § 407(a)'s prohibition is not triggered by this kind of reimbursement provision because the insurance company 'seeks the amount it overpaid [the claimant rather than] any of [the claimant's] Social Security benefits.'" Herman v. Metropolitan Life Ins. Co., 2008 WL 5246319 at *2 (M.D. Fla. Dec. 16, 2008) (quoting Mattox v. Life Ins. Co. of N. Am., 536 F. Supp. 2d 1307, 1327 (N.D. Ga. 2008)).

The Court agrees with the opinion in Herman. Hartford is not seeking to recover Social Security disability benefits through an assignment from Plaintiff; Hartford is seeking to recover an overpayment from monies that Hartford previously paid to Plaintiff. Attempting a recovery of overpayment is not the same as directly assigning Social Security benefits. Thus, § 407(a) is inapplicable to the case at hand.

IV. **Plaintiff's Motion for Summary Judgment**

Plaintiff's Motion for Summary Judgment (Doc. 26) raises issues almost identical to the issues raised in the Defendant's Motion for Judgment on the Administrative Record. Thus, by deciding the Defendant's Motion, many of the issues raised in Plaintiff's Motion have been resolved. The only argument that

Plaintiff raised in his Motion that has not been addressed fully is whether Hartford's decision to terminate benefits was wrong and unreasonable because the EAR completed by Mr. McNeeley improperly calculated Plaintiff's earning requirement.

Plaintiff argues that the wage calculations provided in the EAR are off-base and do not properly represent the actual pay that Plaintiff would receive at the jobs recommended in Mr. McNeeley's report. The approximation of wages used for the EAR is compiled using wage data from an Occupational Employment Statistics (OES) survey. (AR 115.) This survey breaks occupations down into categories. Plaintiff contends that these categories are overly broad and the wages vary greatly within these categories, meaning that an adequate approximation of Plaintiff's wages in any of the five jobs to which he was matched is unreliable.

Plaintiff's argument misses the mark. The issue in this case is not the reliability of the OES data and the wage approximations used in the EAR. A claim administrator reviewing benefits eligibility under an "any occupation" standard is not required to "collect vocational evidence." Richey, 608 F. Supp. 2d at 1312. Hartford did not prepare the statistics in the EAR; Hartford only relied on the information provided in the report reflecting Plaintiff's potential job matches. Hartford was not unreasonable in relying on this vocational information in determining Plaintiff's disability status. This argument does not influence the

Court's opinion that Hartford acted in a right and reasonable manner when it terminated Plaintiff's benefits on June 20, 2009.

V. **Conclusion**

Based on the reasons stated above, the Defendant's Motion for Judgment on the Administrative Record is granted and Plaintiff's Motion for Summary Judgment is denied. The Court finds that Hartford was not *de novo* wrong in terminating Plaintiff's coverage based on the evidence available in the administrative record. Even if Hartford was wrong, the decision made was reasonable, and therefore, is able to withstand scrutiny under the arbitrary and capricious standard.

Further, the Court finds that Plaintiff is liable for repaying Hartford $7,183.50 in overpayment. Plaintiff contractually consented to receive a greater amount of LTD benefits from June 2008 – June 2009, knowing that this could lead to an overpayment. Plaintiff is responsible for repaying the full amount. Defendant is awarded judgment in the amount of $7,183.50.

**SO ORDERED,** this 22nd day of March, 2012.

*/s/ Hugh Lawson*
**HUGH LAWSON, SENIOR JUDGE**

ebr